UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| **ASHLEY DRURY**, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| **VOLUSIA COUNTY, FLORIDA**, ) | **CASE NO.:  6:10-cv-1176-Orl-18DAB** |
| a political subdivision o f the State of Florida, ) | |
| **ROBERT PAUL TAMERIS**, individually, ) | |
| **JECOA DUANE SIMMONS**, individually, ) | |
| **CHRISTIN DUARTE**, individually, ) | |
| **KEVIN SWEAT**, individually and in his ) | |
| official capacity as Director of the ) | |
| Volusia County Beach Patrol, ) | |
| **JAMES DINNEEN**, in his official capacity as ) | |
| County Manager for Volusia County, Florida, ) | |
| **MARY ANNE CONNORS**, in her official ) | |
| capacity as Deputy County Manager for ) | |
| Volusia County, Florida, and ) | |
| **MIKE COFFIN**, in his official capacity as ) | |
| Director of the Volusia County Department ) | |
| of Public Protection, ) | |
| ) | |
| Defendants. ) | |
| _____/ | |

## PLAINTIFF'S RESPONSE TO
## DEFENDANTS, JECOA DUANE SIMMONS' AND ROBERT PAUL TAMERIS'
## MOTION FOR SUMMARY JUDGMENT
## AND INCORPORATED MEMORANDUM OF LAW

Plaintiff files this Response to the Motion for Summary Judgment filed by Jecoa

Duane Simmons and Robert Paul Tameris (Doc. 107) and says:

Ashley Drury filed this civil rights claim against Tameris and Simmons because

they used their authority as Beach Patrol officers to sexually abuse the Plaintiff. Plaintiff

also asserts claims for battery and intentional infliction of emotional distress under state law. The record fully supports each of her claims.

## STATEMENT OF MATERIAL FACTS

Ashley Drury was employed as a lifeguard by Volusia County beginning in April 2008. (Doc. 113 at 31). The Plaintiff was sixteen years old at the start of her employment and turned seventeen during the course of the summer. (Doc. 113 at 10, 87, 265). She worked in the Daytona zone which was considered the busiest and most prestigious on the beach. (Doc. 113 at 40, 43). Tameris and Simmons are child molesters who were employed by the Volusia County Beach Patrol. Tameris was a sworn law enforcement officer. (Doc. 113 at 77; Doc. 111-1 at 10). Simmons was a Captain. (Simmons Dep at 9-10).

The Beach Patrol operates through a hierarchical command structure beginning with part-time lifeguards at the bottom, followed by full-time lifeguards and Beach Safety Specialists (BSS), then sworn law enforcement officers, sworn Captains, then Deputy Directors, up to Director Sweat. (Doc. 113 at 70; Bussinger Dep at 17; Wooden Dep at 23; Tameris Dep at 14-19; Duarte Dep at 15-16). Captains are formally referred to as "supervisors" and are charged with controlling particular zones along the beach. (Bussinger Dep at 20; Hensler Dep at 15, 20; Sweat Dep at 84; Yackel Dep at 154). Captains have significant supervisory responsibilities including disciplinary authority (from oral reprimands and write-ups up to suspensions of seasonal lifeguards under exceptional circumstances); scheduling; recommendations for hiring/firing and day-to-day work assignments. (Bussinger Dep at 20, 21, 73 [disciplinary write-ups and suspensions, day-to-day supervision and assignments]; Hensler Dep at 30 [assignments];

Prugar Dep at 36 [rehiring and zone assignment]; Condon Dep at 34 [firing]). All of the lifeguards deposed in this case acknowledge that both the officers and the captains had supervisory roles.  (Doc. 113 at 42, 72, 124-125; Duarte Dep at 128 ("[Y]ou pretty much look at all of them as your supervisor, all the officers").

Defendants repeatedly claim throughout their brief that "Defendants were not Ms. DRURY's supervisors and did not exercise or assert any authority over Ms. DRURY." (Doc. 107 at 10). However, the record is absolutely clear that they *were* Ms. Drury's supervisors and *did* exercise a substantial degree of control over her. The Defendants' own words best prove this point:

> Q.    How do you know Miss Drury?
>
> A.    She worked at the beach department the same time I did.
>
> Q.    Do you know what her position was with the beach department?
>
> A.    Part-time lifeguard.
> ….
>
> Q.    Were you her supervisor?
>
> A.    One of her supervisors.   (Simmons Dep at 8)
> ….
>
> Q.    And what would be the titles or job descriptions of the kind of people that would report to you when you were captain?
>
> A.    Part-time lifeguards, full-time lifeguards, senior lifeguards.
>
> Q.    And as just kind of a general guide, about how many people are we talking about that would report to you at any one time?
>
> A.    I guess there's times during a shift you're the only acting supervisor on the beach, so every employee that is on duty at that time. (Simmons Dep at 39-40).

(*See, also*, Doc. 113 at 79, 124-125; Tameris Dep at 10).

Tameris was well known among his colleagues as a constant flirt with a particular affinity for young girls. (Stafford Dep at 62, 119 ("Q. What do you know of Mr. Tameris' reputation?   A. He's a pervert…"); Bussinger Dep at 56 ("Bobby Tameris had a reputation of liking women younger than him."); *See, also*, Gardner Dep at 32; Williams Dep at 34; Prugar Dep at 10; Shaw Dep at 15; Ligouri Dep at 17). Tameris displayed pictures of nude girls in his locker and often texted pictures of naked women to his co-workers (Conlon Dep at 48; Manhard Dep at 11-12).

Unfortunately, Tameris did more than merely flirt. He is known to have had sexual intercourse with a number of minors in addition to Ms. Drury. (Atkinson Dep at 9, 11, 13 [describing ten instances of sexual intercourse with Tameris when she was seventeen years old); Parker Dep at 13-17 [digital penetration and genital contact with 16 year old];   Other minors were merely groped or propositioned for sex. ([Ligouri Dep at 12, 14-16, 22-23 [flattering text messages, request for sexual intimacy and groping of buttocks when she was sixteen]; Medina Dep at 21 [asked to "make out with him"]). Much of that activity occurred when Tameris was on duty at the various lifeguard stations. (Atkinson Dep at 11; Ligouri Dep at 14; Medina Dep at 18-21; Rancourt Dep at 14-22). On one occasion Captain Prugar was contacted by the Daytona Beach Shores Police Department because Tameris had been detained for drinking with underage kids. (Prugar Dep at 7-9). This incident was apparently well-known to other members of the Beach Patrol. (Condon Dep at 12-13).

While Simmons did not have the same reputations as a womanizer, he is known to have made use of County facilities to  engage in sexual intercourse while on duty.

(Rancourt Dep at 23-26).[1]

Tameris and Simmons each used a similar technique to seduce Ashley Drury: they introduced themselves as her supervisors and began a cynical courtship through flattering text messages which became increasingly graphic and sexual as time went by. (Doc. 113 at 81, 99-101, 140; Ex. 5; Simmons Dep at 10-12; Duarte Dep at 85-86, 92-94, 102-03).

Plaintiff first met Tameris at their workplace at the end of July or beginning of August, 2008 – probably on August 5th. (Doc. 113 at 77, 86). Tameris drove up to Plaintiff's work station, introduced himself and spent a few minutes engaged in small talk. (Doc. 113 at 77-78). Tameris generally did not wear his shirt when riding in the County truck, but it is uncertain whether he was clothed on this occasion. (Doc. 113 at 114-116).  Plaintiff found this attention both unusual and flattering. None of the other law enforcement officers spoke to junior lifeguards in this manner - they merely waved from a distance on their rounds. (Doc. 113 at 79-81). During the course of this initial conversation, Tameris asked Plaintiff how old she was and Ms. Drury confirmed that she was only sixteen. (Doc. 113 at 78).

Shortly after this initial flirtation, Tameris started sending the first of hundreds of text messages to Ms. Drury. (Doc. 113 at 81, 97-101, Ex. 5).The first text was apparently sent on the evening of August 9, 2008. (Doc. 113 at 85). At first, the messages were friendly and relatively innocuous: "Oh, you looked really nice today"; I like your butt"; "I

---

[1]   Simmons asserted the Fifth Amendment privilege with respect to all questions concerning Christie Rancourt and his on-duty sexual encounter with her at the lifeguard station. (Simmons Dep at 15-18).

like watching you run or swim when you do drill." (Doc. 113 at 99). However, they soon progressed to texts of a sexual nature. (Doc. 113 at 100-101).

Plaintiff's relationship with Simmons progressed in the same fashion. She met him on the beach in his capacity as Captain of the Daytona zone. They began exchanging text messages in December 2008, which began in a fairly innocuous manner, and became increasingly graphic over time:

> I remember he used to tell me that he wanted to touch my lips and kiss my lips. And then he proceeded to tell me that he wanted to have sex with me.

(Doc. 113 at 140, *See, also*, Doc, 113 at 141, Ex. 5).

Plaintiff testified that she found the sexual messages flattering, but disturbing. Flattering because this was the first time that anyone had paid her a sexual compliment; disturbing because of the age difference between the parties and because the Defendants were her supervisors at work. (Doc. 113 at 101, 109, 111, 169, 171, 280, 287-88):

AS TO TAMERIS

> A.      I was flattered that he took an interest in me and that he admired me. By what he said, I gathered that he developed a liking and admiration for me so I was flattered by that.   (Doc. 113 at 109).
> ….
>
> Q.      When you received the sexually explicit text messages, how did you feel?
>
> A.      Somewhat flattered, somewhat violated.
> ….

AS TO SIMMONS

> Q.      Okay. Did you appreciate the remarks of Mr. Simmons? Did you enjoy them? Did they flatter you?
>
> A.      I was flattered, but I almost felt violated, because he was a little – he was more explicit in the text.  (Doc. 113 at 140).

<u>AS TO BOTH DEFENDANTS</u>

… It's embarrassing to admit something like that. It's extremely embarrassing for a girl to have to come forward and say something like that, extremely.

Q.    Something like what?

A.    That this older man is texting me these…   (Doc. 113 at 171).

Plaintiff had sexual intercourse with Tameris and Simmons. (Doc. 113 at 102-03, 106-07, 136-38, 165-66).[2] She was between sixteen and seventeen when she had sex with Tameris; she was seventeen when she had sex with Simmons. (Doc. 113 at 10, 87, 265, 334-35). The Defendants were, respectively, 43 and 35. (Doc. 111-1 at 5, Simmons Dep at 4). The sexual intercourse with Simmons took place at the Main Street lifeguard station when Simmons was on duty:

Q.    Okay. And is it your testimony that [Simmons] was working, he was on duty?

A.    Yes.

Q.    And where was he working?

A.    He was working the night shift. He was either working the night shift, patrolling the beach, or he was working in the parking garage at the Ocean Walk.
….

Q.    Okay. And where did you have sex with him?

A.    At the Main Street lifeguard station.

(Doc. 113 at 137). Her sexual relations with Tameris did not take place on County property or during work hours. (Doc. 113 at 103, 157, 162).

---

[2]  Tameris asserted his Fifth Amendment privilege when asked whether he had sex with the Plaintiff. (Doc. 111-1 at 44-46, 49-50). Simmons denied any sexual contact with the Plaintiff (Simmons Dep at 6-7).

Ms. Drury testified in no uncertain terms that she submitted to sex with Tameris,

and Simmons specifically because they were her superiors:

> Q.     What is meant by the allegation that Tameris, Simmons and Duarte
> used their position as your superior officers to foster that relationship?
>
> A.     Like I had previously said, I felt like I -  I felt like I had an
> obligation. And had I said no, something could have been said against me,
> not in my favor.
>
> Q.     What made you feel you had an obligation to have sex with these
> men?
>
> A.     Because they were my superiors.  (Doc. 113 at 166-67).
> ….
>
> Q.     And please explain what you mean by that you were forced to have
> sexual intercourse and that it occurred in a coercive environment? What do
> you mean by that, a coercive environment?
>
> A.      I saw them as my superiors. I felt like that was a coercive
> environment. (Doc. 113 at 177).

Plaintiff feared that, if she rebuffed the Defendants' demands for sex that she would

suffer retaliation at work in the form of reassignment to a less desirable work zone and

would be shunned socially:

> Q.     You have said that you felt like if you denied or refused to have
> sex with Mr. Tameris, that people would treat you differently at work; do
> you remember saying that?
>
> A.     Yes.
>
> Q.     Or that you would be denigrated by others?
>
> A.     Yes.  (Doc. 113 at 124).
> ….
>
> A.     Because I feared that I would be demoted, put in another zone, I
> would not get work, I would – he would start rumors. He could say things
> about me to other people that we worked with. He could use it to his
> advantage and kind of not make me look like a good lifeguard or a nice
> person. (Doc. 113 at 125).
> ….

A.      I also kind of felt forced that I had to accept them and not deny them.  (Doc. 113 at 127).

….

A.      … I felt like I was coerced. I felt like had I not, I could have been demoted or whatever you call it. I felt like I was obligated to. (Doc. 113 at 296).

Ms. Drury also feared that she would not be rehired if she said "no" to Defendants' demands for sex. (Doc. 113 at 190).

Ms. Drury's fear of retaliation was not merely subjective or theoretical. Another minor lifeguard, Danielle Smith, experienced retaliation from administrators and co-workers after she disclosed sexual contact with another officer, Curt Geber. (Smith Dep at 127-27, 141, 159-161, 164, 170-71; *See, also*, Doc. 113 at 131, 143). Tameris threatened that same lifeguard with a reprimand if she would not go out with him. (Smith Dep at 81: "Q.  Who suggested that to you, that you would be reprimanded if you didn't go out with them?  A.  Um, Bobby Tameris.").

Volusia County ultimately conducted an internal affairs investigation with respect to Plaintiff's allegations. The investigation sustained each of those charges. (Sweat Dep at Ex. 18, 19, 24, 30).

The sexual activity between Defendants and Ms. Drury was coerced, offensive and harmful. Ms. Drury could not legally consent to sexual intercourse by virtue of her age. However, beyond the legalities, the abuse was coercive because of Defendants' position of authority over the Plaintiff. (Doc. 113 at 166-167, 177).

Ms. Drury has suffered damages as a result of this sexual abuse. In addition to the physical violation of her person (Doc. 113 at 222), Ms. Drury has suffered and continues to suffer emotional harm. (Doc. 113 at 224). Those psychic injuries have manifested

themselves as anxiety, generalized fear of men, difficulty sleeping and a decline in her current sexual relationship. (Doc. 113 at 226, 228-30, 232, 233, 314-16). Plaintiff's expert testified that Ashley suffers from depression and shows many of the symptoms of Post Traumatic Stress Disorder. (Bailey Dep at 98-113, Ex. 6). Ms. Drury testified in some detail how flashbacks to these events cause her to "shut down" and discontinue normal sexual activities with her long-time boyfriend. (Doc. 113 at 228-30). At times she recoils at his touch because she is reminded of the abuse by Tameris and Simmons. (Id.). Her relationship with her parents and brother has been irrevocably altered. (Doc. 113 at 234).

## DISPUTED ISSUES OF MATERIAL FACTS

Plaintiff maintains that there are no disputed issues of material fact as to Tameris. Tameris asserted the Fifth Amendment privilege as to every substantive question concerning his relationship with Ms. Drury, including all questions concerning sexual intercourse. (Doc. 111-1 at 44-46, 49-50). The Court is free to adopt an inference that Tameris refused to testify because the evidence would harm his defense. *See*, U.S. v. Premises Located at Route 13, 946 F.2d 749, 756 (11th Cir. 1991); *See, also*, Baxter v. Palmigiano, 425 U.S. 308, 318-19, 96 S.Ct. 1551, 1558 (1976) (The Supreme Court case establishing the general rule).

Simmons also asserted the Fifth Amendment privilege as to certain material issues in this case.[3] However he denied having intercourse or any inappropriate relationship

---

[3]  Simmons refused to answer any questions pertaining to his relationship with Christie Rancourt and the fact that they had sexual intercourse at the Main Street lifeguard station while he was on duty. (Simmons Dep at 15-18).

with the Plaintiff. He does acknowledge sending her hundreds of text messages, but claims that they amounted only to "casual conversation". (Simmons Dep at 10, 14). He also acknowledges looking up Plaintiff's personal motor vehicle records in the DAVID system and offers no explanation for why he did so. (Simmons Dep at 33-35).

There is no real dispute that the Defendants held positions of authority and supervised Plaintiff when she was employed as a lifeguard. Tameris was an officer assigned primarily to the Daytona zone and Simmons was the Captain responsible for that zone.

The Defendants dispute whether they used their position of authority in order to seduce the Plaintiff. However, there is substantial evidence that they did so. In addition, strong corroborating evidence is provided by Danielle Smith, another minor lifeguard, who testified that she was "hit on" by both Tameris and Simmons (Smith Dep at 37-38, 81-83, 159-161) and that she declined to report these instances out of fear of retaliation. (Smith Dep at 127-28, 141, 159-61, 164, 170-71, 174-75; *See, also*, Doc. 113 at 131, 143). At the very least, the facts present a jury question on the issue of supervision and authority.

## MEMORANDUM OF LAW

### I.      STANDARD FOR SUMMARY JUDGMENT

Summary Judgment is proper only "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.  The moving party bears the initial

burden of showing the Court that there are no genuine issues of material fact in the record

which would require a trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 106 S.Ct. 2548

(1986). The evidence, and all inferences drawn from the facts, must be viewed in the light

most favorable to the non-moving party. <u>Id</u>. The Eleventh Circuit has elaborated on the

requirement that trial courts refrain from deciding disputed issues of fact by summary

judgment:

> To the extent that evidence conflicts at summary judgment, the district
> court has an obligation to "view all evidence and make all reasonable
> inferences in favor of the party opposing summary judgment." (citations
> omitted). If a reasonable fact finder evaluating the evidence could draw
> more than one inference from the facts, and if that inference introduces a
> genuine issue of material fact, then the court should not grant summary
> judgment. (citations omitted). "Credibility determinations, the weighing of
> the evidence, and the drawing of legitimate inferences from the facts are
> jury functions, not those of a judge, whether he is ruling on a motion for
> summary judgment or for a directed verdict. The evidence of the
> nonmovant is to be believed, and all justifiable inferences are to be drawn
> in his favor." (citation omitted).

<u>Allen v. Board of Public Educ. for Bibb County</u>, 495 F.3d 1306, 1315 (11th Cir. 2007).

As noted throughout this Response, Plaintiff can point to substantial facts which would

justify a jury verdict in her favor.

## II.   <u>SEXUAL MOLESTATION OF A MINOR BY A LAW ENFORCEMENT OFFICER CONSTITUTES A VIOLATION OF THE FOURTH AMENDMENT</u>.

Plaintiff's primary cause of action in this case is based on the violation of her

Fourteenth Amendment right of bodily integrity – a well-recognized substantive due

process right. <u>See</u>, <u>U.S. v. Lanier</u>, 520 U.S. 259, 117 S.Ct. 1219 (1997) (Recognizing a

due process right to be free of sexual assault committed under color of state law or

authority). The Defendants do not claim that this cause of action is unavailable to

Plaintiff, nor could they under controlling law. Instead, the Defendants focus on Plaintiff's alternative claims for violation of the Fourth Amendment rights and for her Fourteenth Amendment right of Equal Protection.[4]

With respect to Plaintiff's Fourth Amendment rights, Defendants assert there is no violation because Plaintiff was not molested incident to an arrest or police investigation. While it is true that Plaintiff was not a criminal suspect and was not arrested, the law does not confine a Fourth Amendment claim to such narrow parameters. The record shows that Plaintiff was sexually abused specifically because the Defendants were acting in their official capacities as law enforcement officers.

The Courts recognize that sexual abuse can also constitute a Fourth Amendment violation:

> [E]ven though this case does not involve excessive force in the traditional sense, it still falls within the Fourth Amendment.... Beyond the specific proscription of excessive force, the Fourth Amendment generally proscribes "unreasonable intrusions on one's bodily integrity," Headwaters Forest, 240 F.3d at 1199, and other harassing and abusive behavior that rises to the level of "unreasonable seizure." Fontana has alleged facts that would constitute an unreasonable seizure and an unlawful intrusion on her bodily integrity in this case.

Fontana v. Haskin, 262 F.3d 871, 878-79 (9th Cir. 2001); *Compare*, Stidham v. Jackson, 2009 WL 792961, *3 (W.D. Va. 2009) (Law enforcement who followed a citizen home, refused to leave and then sexually assaulted her, effected a "seizure" which would support a damages claim under the Fourth Amendment).

---

[4] Tameris and Simmons do not assert any defenses based on qualified immunity.

III.   **SEXUAL MOLESTATION OF A MINOR BY A GOVERNMENT ACTOR CONSTITUTES A VIOLATION OF THE FOURTEENTH AMENDMENT.**

Defendants argue that Plaintiff's Equal Protection claim is merely duplicative of her substantive due process claim. While largely true, that does not mandate the denial of the Equal Protection claim. Rather, Plaintiff is entitled to proceed under both theories as alternative claims. *See, e.g.*, Gutzwiller v. Fenik, 860 F.2d 1317, 1329 (6th Cir. 1988) ("[T]he jury could have found that [defendants] intentionally discriminated against Gutzwiller, thereby denying her equal protection, it also could have found that these defendants denied Gutzwiller substantive due process.").

Defendants also claim that there was no gender-based discrimination because Defendants simply prefer to have sex with women and Plaintiff happened to be a woman (or, in this case, a girl). Other Courts have specifically rejected this argument. *See*, Chivers v. Central Noble Community Schools, 423 F.Supp.2d 835, 852 (N.D. Ind. 2006) ("The Seventh Circuit has specifically rejected the argument that harassment based on sexual desire is not based on gender." [*citing* King v. Bd. of Regents of Univ. of Wis. Sys., 898 F.2d 533, 539 (7th Cir.1990), Volk v. Coler, 845 F.2d 1422, 1433 (7th Cir.1988) and Bohen v. City of East Chicago, Ind., 799 F.2d 1180, 1187 (7th Cir.1986)]); *See, also*, E.E.O.C. v. Farmer Bros. Co., 31 F.3d 891, 897-98 (9th Cir. 1994) ("[A]n employee [who] becomes the victim of her boss' unwanted sexual attention… may be forced to tolerate his sexually harassing conduct for fear that her job or her advancement in the company are at risk. A woman in this circumstance may reasonably feel subordinated and belittled even though the harasser's primary purpose is to seduce her.").

Plaintiff's gender is an immutable characteristic. *See*, <u>Mississippi University for Women v. Hogan</u>, 458 U.S. 718, 723, 102 S.Ct. 3331, 3335 (1982).  Defendants singled out Ashley Drury for abuse because she was a female. Accordingly, Plaintiff can plead and prove a violation of the Equal Protection clause.

## IV.   <u>TAMERIS AND SIMMONS ACTED UNDER COLOR OF STATE LAW.</u>

In  the Eleventh Circuit, "[a] person acts under color of state law when he acts with authority possessed by virtue of his employment with the state," <u>Almand v. DeKalb County</u>, 103 F.3d 1510, 1513 (11th Cir. 1997); *See, also*, <u>Burrell v. Board of Trustees</u>, 970 F.2d 785, 790 n. 12 (11th Cir. 1992) (Same).

> Color of law means "pretense of law," and it does not necessarily mean under authority of law. <u>United States v. Jones</u>, 207 F.2d 785, 786-87 (5th Cir. 1953). A state official may act under color of law even when engaging in an illegal activity.… "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken under color of state law." … Further, it is not significant to the color of law analysis that the defendant's misuse of power "was motivated solely for personal reasons of pecuniary gain." <u>Brown v. Miller</u>, 631 F.2d 408, 411 (5th Cir. 1980) (color of law analysis under 42 U.S.C. § 1983). "[T]he lack of outward indicia suggestive of state authority - such as being on duty, wearing a uniform, or driving a patrol car - are not alone determinative of whether a police officer is acting under color of state law." <u>Revene v. Charles County Comm'rs</u>, 882 F.2d 870, 872 (4th Cir. 1989).

<u>U.S. v. Picklo</u>, 190 Fed.Appx. 887, 888-89 (11th Cir. 2006).

Defendants argue that they were merely acting as "private individuals" when they sexually abused the Plaintiff. They also maintain that their supervisory role was completely coincidental – that Plaintiff would have had sex with them even if they were not superior officers. The record does not bear out this argument.

The individual Defendants were able to inflict injury on the Plaintiff specifically because of their position as law enforcement officers with supervisory responsibility over minor children, including the Plaintiff. *See*, <u>West v. Atkins</u>, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255 (1988), *quoting*, <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 936, n. 18, 102 S.Ct. 2744, 27553 (1982) ("[S]tate employment is generally sufficient to render the defendant a state actor.").

That is particularly true with respect to Captain Simmons who exercised day-to-day control over the entire Daytona zone where Plaintiff worked. The undisputed facts also show that Plaintiff was very much influenced by the authority wielded by those officers and feared retribution if she refused their advances. (Doc. 113 at 124-25, 127, 166-67, 177, 190). At least one other minor lifeguard experienced retaliation from administrators and co-workers after she disclosed sexual contact with another officer. (Smith Dep at 127-27, 141, 159-161, 164, 170-71, 174-75; *See, also*, Doc. 113 at 131, 143). Tameris threatened that same lifeguard with a reprimand if she would not go out with him. (Smith Dep at 81).

The determination whether a government employee is acting under color of state law is fact intensive and must be determined on a case-by-case basis. <u>Griffin v. City of Opa-Locka</u>, 261 F.3d 1295 (11th Cir. 2001). This record would easily support a jury finding that the two perpetrators were acting under color of state law and that Plaintiff would not have been harmed had that government-granted authority not been abused. Such a finding would be well-supported by case law where other perpetrators of sexual abuse have used their official position to violate citizens' constitutional rights. *See, e.g.*, <u>Griffin v. City of Opa-Locka</u>, *supra*; <u>Doe v. Taylor Independent School Dist.</u>, 15 F.3d

443, 455 (5th Cir. 1994; <u>Johnson v. Cannon</u>, 947 F.Supp. 1567 (M.D. Fla. 1996); <u>Hackett v. Fulton County School Dist.</u>, 238 F.Supp.2d 1330 (N.D. Ga. 2002).

## V.    <u>SUPERVISORY CONTROL</u>

Defendants argue that they were not acting under color of state law because they were not Plaintiff's supervisors. However, the record shows that this is not the case; both Tameris and Simmons had significant supervisory duties and could directly affect Plaintiff's employment conditions. Indeed, the job title for captain-level personnel (including  Simmons) is actually "supervisor". Plaintiff's fear of retribution if she declined Defendants' sexual demands was not merely the subjective opinion of a seventeen year old girl (although the fact that she was a minor is obviously quite relevant).

The record shows that other lifeguards were reassigned as a disciplinary measure (Yackel Dep at 14-15; Duarte Dep at 25-36 [reassigned after showing disrespect to a Captain]). Danielle Smith, another minor lifeguard, testified that Tameris specifically threatened to take adverse employment action against her if she refused to go out with him. (Smith  Dep at 81:  Ms. Smith testified to actual retaliation following her report to the administration of sexual molestation by Officer Curt Geber. (Smith Dep at 127-27, 141, 159-161, 164, 170-71).

Ultimately, the issue is not whether Defendants could directly hire or fire Plaintiff but whether they used a position of authority granted by the government to effect the constitutional violation. <i>See</i>, <u>Bonenberger v. Plymouth Tp.</u>, 132 F.3d 20, 23 (3d Cir. 1997) ("A state employee may, under certain circumstances, wield considerable control

over a subordinate whose work he regularly supervises, even if he does not hire, fire, or issue regular evaluations of her work."). The Defendants were sworn law enforcement officers. They were introduced to Plaintiff as superior officers and acted in that capacity at all times material to this case.

> **2.      THE RECORD SHOWS THAT TAMERIS AND SIMMONS USED THEIR STATE-GRANTED AUTHORITY TO VIOLATE PLAINTIFF'S CIVIL RIGHTS.**

The Defendants compare their despicable actions to other cases in which the perpetrators engaged in "hazing" or consensual "horseplay". (Doc. 107 at 16). No one in this universe can properly characterize the sexual molestation of a sixteen year old girl as "horseplay".

The Defendants emphasize the fact that Ms. Drury was off duty when the sexual abuse occurred. (Doc. 107 at 17). However, they neglect the record evidence that shows that Captain Simmons was on duty at the time he molested Ashley and that the incident occurred at the lifeguard station. (Doc. 113 at 137). The record evidence also shows that the initial seduction of Ms. Drury through text messages, phone calls and personal interaction occurred while all of the participants were on duty. (Doc. 113 at 81, 99-101, 140; Ex. 5; Simmons Dep at 10-12).

Defendants suggest through use of a hypothetical that Ms. Drury knew how to say "no" to an improper order from a superior at work. (Doc. 107 at 18).  However, the record clearly shows that Ms. Drury did not know how to refuse these advances – she specifically testified that she did not know how to respond to the Defendants' overtures or to say "no" to their sexual demands. (Doc. 113 at 296 ["I didn't know how to say no"];

*See, also*, Doc. 113 at  101, 166-67, 169, 280, 287, 296). The Defendants also cannot escape the fact that they abused a minor child. Both legislators and judges are fully aware of the fact that a minor's judgment is not of the same quality as an adult's and that special legal protections are required for children. This is exactly why the State of Florida makes sex between a minor and a person over the age of 24 illegal. *See*, §794.05, Fla.Stat.. This case does not present a situation where two equals decide to engage in consensual sexual relations. Instead, the record reflects two much older adults using their positions as law enforcement officers and superiors at work to seduce and molest a minor child.

The record also shows that Plaintiff's experiences were not unique. Several other victims of sexual abuse and unwanted attention from Tameris and Simmons testified that those events occurred during work hours and at County facilities.   (Atkinson Dep at 11; Ligouri Dep at 14; Medina Dep at 18-21; *See, also*, Rancourt Dep at 14-22).[5] It is clear from this record that Tameris and Simmons used their positions as law enforcement officers to molest these youngsters, including Ashley Drury. At the very least, a fact issue is present which must be resolved by a jury rather than decided through summary judgment.

---

[5]   It has probably not escaped the Court's attention that Defendants confine their discussion of the record to Plaintiff's deposition  -  and only Plaintiff's deposition. In fact, the record in this case is far richer and includes depositions nearly two dozen witnesses. Those other witnesses testify to other instances of sexual abuse by the Defendants; they verify the fact that Defendants exercised a considerable degree of supervisory control over Plaintiff and her peers, and that retaliation was threatened and actually occurred to other lifeguards.

**3.     THE SEXUAL ABUSE WAS MADE POSSIBLE BECAUSE OF DEFENDANTS' POSITIONS AS LAW ENFORCEMENT OFFICERS AND BEARS NO RESEMBLANCE TO A CASUAL PERSONAL RELATIONSHIP.**

Ashley Drury did not "date" the Defendants; she had sex with them on several occasions because they were her superior officers. Ms. Drury certainly did date people. The record shows that she had sexual relationships with age-appropriate peers, (Doc. 113 at 134-35) including a long-time monogamous relationship with her current boyfriend, Kris Yackel. (Doc. 113 at 227-29; Yackel Dep at 23-24, 27-28). Tameris was not an age-appropriate suitor in a conventional relationship. He was a 43 year old officer who supervised Plaintiff at work. The same is true with respect to Simmons who, as a 36 year old Captain, was Tameris' superior as well as Plaintiff's. The record also shows that both officers preyed regularly on young lifeguards whom they met and supervised in their roles as Beach officers. (Atkinson Dep at 9, 11, 13; Parker Dep at 13-17; Ligouri Dep at 12, 14-16, 22-23; Rancourt Dep at 14-22). These facts do not support a conclusion that Plaintiff slept with the Defendants because she wanted a personal relationship with them or that they wanted anything to do with her other than to satisfy a biological urge. Rather, the record shows that Plaintiff was one of many young victims who were coerced into having sex with these two Beach officers *because* they were Beach officers.

Defendants cite to a number of cases where §1983 claims were denied because the offending employee was not found to be acting under color of state law. However, the law clearly allows a claim of this nature and there are numerous other cases where liability has been sustained against officers taking advantage of under-age girls by virtue of their government jobs. *See, e.g.*, Griffin v. City of Opa-Locka, 261 F.3d at 1304

(Plaintiff had adequately stated a claim that the city manager was acting under color of state law when he raped his employee); Doe v. Taylor Independent School Dist., 15 F.3d 443 (5th Cir. 1994) (Teacher's sexual misconduct with high school student took place under color of state law where he took advantage of his position as a teacher and coach to seduce her and sexual activity took place on school grounds); Hackett v. Fulton County School Dist., 238 F.Supp.2d 1330, 1357 (N.D. Ga. 2002) (Plaintiff presented sufficient evidence that science teacher acted under color of state law where teacher lured plaintiff to his home under the pretense of a fictitious scholarship program).

The point to be made here is that these are fact-specific inquiries that will not be decided by citing one case against another. Rather, it is the facts of *this* case which are determinative. The record in this case shows that Tameris and Simmons used their positions of authority to seduce and molest Plaintiff when she was still a child. At the very least, the facts are sufficiently disputed to require a trial by a jury.

## VII.   STATE LAW BATTERY

"Battery consists of the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent". Quilling v. Price, 894 So.2d 1061, 1063 (Fla. 5th DCA 2005). Each of those elements is manifest in the evidence adduced in this case. The Defendants continue to argue that sexual intercourse with Ashley Drury should not be actionable because she gave consent. This Court has already rejected that proposition. (Doc. 77 at 9, n. 7). That argument is also precluded by §794.05, Fla.Stat. which makes it a crime for a person aged 24 or older to have sex with a child of 16 or 17. As a matter of law, a child under the age of 18

cannot consent to sexual intercourse. *See*, <u>Shaw v. Fletcher</u>, 137 Fla. 519, 522, 188 So. 135, 136 (Fla. 1939) ("Illicit intercourse with a female below the age of consent fixed by a statute punishing carnal knowledge with such females is a civil tort to which she cannot consent…"). Sexual intercourse between a 43 or 35 year old man and a minor incapable of giving consent is offensive contact of a kind which society will not tolerate.

Plaintiff certainly perceived the sexual contact to be offensive:

Q.     If you've had sex consensually with a number of people, why was it just these three people where it was offensive?

A.     Because I was in – I felt like I was coerced. I felt like had I not, I could have been demoted or whatever you want to call it. I felt like I was obligated to.

Q.     That's why it was offensive sex?

A.     It was illegal.

Q.     Was the contact itself offensive, the mere fact that you were having sex, was that offensive to you?

A.     Yes.   (Doc. 113 at 295-96).

Defendants suggest that their inability to argue the issue of consent makes this a strict liability tort which is "fundamentally unfair". (Doc. 107 at 28). That is not the case. Plaintiff must still prove that the offensive contact occurred. In addition, Plaintiff must show that the Defendants intended to touch her. There is no question that these elements do not amount to a strict liability tort and there is nothing unfair about holding the Defendants liable for their actions. After all, the Defendants are not claiming that they accidentally had sex with the Plaintiff.

## VIII.   **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

In order to recover damages for intentional infliction of emotional distress, Plaintiff must plead and prove the following: (1) the defendant acted recklessly or intentionally; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff's emotional distress; and (4) plaintiff's emotional distress was severe. *See*, Johnson v. Thigpen, 788 So.2d 410, 412 (Fla. 1st DCA 2001). The common formulation of an action which would justify recovery for intentional infliction of emotional distress is whether the recitation of facts to an average member of the community would lead him to exclaim, "Outrageous!" *See*, Metropolitan Life Ins. Co. v. McCarson, 467 So.2d 277, 278-79 (Fla. 1985). Plaintiff submits that any human person reading this record will conclude that Defendants' actions were outrageous.

Defendants claim that Plaintiff's emotional distress was not sufficiently "severe". However, the record demonstrates otherwise. Ms. Drury continues to suffer from anxiety, difficulty sleeping and has experienced a decline in her current sexual relationship. (Doc. 113 at 226, 228-30, 232, 233, 314-16). Her life has been irrevocably altered. At the very least, the record shows sufficient facts to support a jury determination in her favor. Compare, Wilson v. Corinthian Colleges, Inc., Case No. 6:04-cv-896-Orl-28KRS (M.D. Fla. Nov. 4, 2005 [Doc. 57]) (unpublished) ("[I]ssues of fact remain regarding … whether Mr. Mella's conduct rises to the level of "outrageousness" required under Florida law…").

WHEREFORE, Plaintiff prays that the Court deny the Defendants' Motion for Summary Judgment in its entirety.

*Respectfully submitted,*

BRETT HARTLEY, P.A.                     GARY S. EDINGER & ASSOCIATES, P.A.

                                        _____/s/ Gary S. Edinger_____

BRETT HARTLEY, Esquire                  GARY S. EDINGER, Esquire
Florida Bar No.: 140317                 Florida Bar No.: 0606812
Brett Hartley, P.A.                     305 N.E. 1st Street
102 S Riverside Dr                      Gainesville, Florida 32601
New Smyrna Beach, FL 32168              (352) 338-4440/ 337-0696 (Fax)
(386) 427-1006/ (386) 427-1065 (Fax)    GSEdinger@aol.com
bretthartley@cfl.rr.com

*Attorneys for Plaintiff*

I HEREBY CERTIFY that a true and correct copy of the foregoing Response to Motion for Summary Judgment has been forwarded to NANCYE R. JONES, LARRY A. SMITH and MARY JOLLEY, Volusia County Assistant County Attorneys, 123 W. Indiana Ave., DeLand, Florida 32720; FREDERICK C. MORELLO, Esquire and MICHAEL G. HOWARD, Esquire, 111 N. Frederick Ave., 2nd Floor, Daytona Beach, Florida 32114; and to DAVID W. GLASSER, Esquire, 116 Orange Avenue, Daytona Beach, Florida 32114, via the CM/ECF System this 15th day of August, 2011.

            _____/s/  Gary S. Edinger_____
            GARY S. EDINGER, Esquire
            Florida Bar No.: 0606812