# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**ASHLEY DRURY,**

**Plaintiff,**

**-vs-**                                              **Case No.  6:10-cv-1176-Orl-28DAB**

**VOLUSIA COUNTY, FLORIDA; ROBERT PAUL TAMERIS; JECOA DUANE SIMMONS; CHRISTIAN DUARTE; and KEVIN SWEAT;**

**Defendants.**

_____

# ORDER

This lawsuit involves allegations of sexual intercourse between three adult males over the age of twenty-nine and a then-minor female, Plaintiff Ashley Drury, all of whom were formerly employed by the Volusia County Beach Patrol ("the Beach Patrol"). Plaintiff asserts that her constitutional rights were violated by the sexual encounters, and pursuant to 42 U.S.C. § 1983 she brings three claims for violations of those rights. She also asserts six claims under Florida law. Named as Defendants are the three men involved in the sexual activity, the director of the Beach Patrol, and Volusia County ("the County").

The case is currently before the Court on the three summary judgment motions filed by the parties.[1]  Having considered the record evidence, the parties' arguments, and

_____

[1] The pertinent filings are:  (1) the Motion for Summary Judgment filed by Defendants Volusia County and Kevin Sweat (Doc. 105), Plaintiff's Response thereto (Doc. 120), and the Reply (Doc. 135) filed by the County and Sweat; (2) the Motion for Summary Judgment filed by Defendants Jecoa Duane Simmons and Robert Paul Tameris (Doc. 107) and

pertinent law, the Court concludes that the motion filed by Tameris and Simmons must be granted as to Plaintiff's federal claims; that the motion filed by the County and Sweat must also be granted as to Plaintiff's federal claims, and that Plaintiff's state law claims shall be dismissed without prejudice to Plaintiff pursuing them in state court.  All three summary judgment motions will accordingly be denied without prejudice as to the state law claims.

## I.  Background[2]

The Beach Patrol is a division of the Department of Public Protection of the County. Employees of the Beach Patrol include part-time lifeguards, full-time lifeguards, and sworn law enforcement officers ("LEOs"); these LEOs, who also are trained as lifeguards, serve the law enforcement function on the County's beaches.[3]  The minimum age to work as a lifeguard for the Beach Patrol is sixteen, and many high school students work as lifeguards full-time during the summer and part-time during the rest of the year.  Currently, during the peak summer season the Beach Patrol employs 58 sworn LEOs, 11 unsworn full-time

---

Plaintiff's Response thereto (Doc. 122); and (3) the Motion for Partial Summary Judgment as to Robert Paul Tameris filed by Plaintiff (Doc. 109) and Tameris's Response thereto (Doc. 123).  Defendant Duarte has not filed a summary judgment motion, but some of the arguments made by the other Defendants apply to the claims against him as well.

[2]The facts in the Background section are taken largely from the deposition testimony of Plaintiff.  For the purpose of ruling on Defendants' motions, her testimony must be accepted as true.

[3]From approximately 1986 to 1996, the law enforcement function on the beach was served by LEOs known as "Beach Rangers" who were not part of the Beach Patrol and were not lifeguards.  In approximately 1996, however, the Beach Rangers were discontinued and lifeguards at the Beach Patrol were cross-trained as LEOs and emergency medical technicians.  Since that cross-training occurred in the mid-1990s the law enforcement function on the beach has been provided by these LEOs who work for the Beach Patrol.

lifeguards who hold the title of Beach Safety Specialist, and 180 to 200 other lifeguards. (Sweat Dep. at 18).

In June 2008, during the summer break between her junior and senior years in high school, Plaintiff—then sixteen years old—began working for the Beach Patrol as a lifeguard. Plaintiff had applied to be a lifeguard earlier that year and had spent her spring break completing the forty-hour course required for employment as a lifeguard. Plaintiff's brother, Shea—three years her elder—had previously worked as a lifeguard for the Beach Patrol.

Among the full-time adult Beach Patrol employees in 2008 were Defendants Robert Tameris, who was forty-three years old at the time and a sworn LEO; thirty-five-year-old Jecoa Duane Simmons, who also was a sworn LEO and held the position of captain; and thirty-year-old Christian Duarte, who had formerly served as a LEO but was no longer sworn and held the position of Beach Safety Specialist.[4]  Defendant Kevin Sweat is the Director of the Beach Patrol and has been since December 2001.

In this lawsuit, Plaintiff claims that in early August 2008, when she was sixteen years old, she had sexual intercourse with Tameris and that after she turned seventeen in mid-August she had sexual intercourse with Tameris on two other occasions. Plaintiff also claims to have had sexual intercourse once with Simmons in November 2008 and once with Duarte in November or December 2008.  When asked at their depositions about these allegations of sexual activity with Plaintiff, Tameris invoked his rights under the Fifth Amendment, (Tameris Dep. at 44-46), while both Simmons and Duarte denied engaging in any sexual

---

[4]Simmons and Duarte were married at the time, but Tameris was not.

-3-

activity with Plaintiff, (Simmons Dep. at 6-7; Duarte Dep. at 123-24).

Plaintiff met Tameris on August 5, 2008 while she was lifeguarding.  (Pl. Dep. at 77, 95).  Tameris was in a truck patrolling the beach with another officer, and he approached Plaintiff's tower and introduced himself.  (Id. at 77).  He told her that if she needed anything to let him know and that he was there to help.  (Id.).  Plaintiff thanked Tameris, who was the first officer who had stopped and gotten out of his truck to speak with her rather than just waving and continuing on.  (Id. at 77-80).

Four days after they first met on the beach, Tameris and Plaintiff began exchanging text messages and talking on their cell phones; according to phone records, the first text message was sent from Plaintiff to Tameris at 6:34 p.m. on Saturday, August 9.  (Id. at 81-87; Ex. 5 to Pl. Dep.).  Tameris sometimes sent Plaintiff texts telling her that he "liked her butt" or "liked watching her run or swim" when she did the morning drills required of the working lifeguards.  (Pl. Dep. at 99).  Tameris also sent her text messages telling her that he wanted to kiss her.  (Id. at 101).  Plaintiff had never received such text messages, and although she enjoyed receiving Tameris's compliments she was unsure "how to take them." (Id. at 100-01, 288).  She responded to Tameris's text messages with "thank you" or "okay." (Id. at 100-01).

Sometime after the first text message on August 9 but before Plaintiff's seventeenth birthday on August 16, Plaintiff and Tameris had sexual intercourse at Tameris's home.  (Id. at 102).  On Plaintiff's birthday, Plaintiff went to a lifeguard banquet, to a tavern, and then to Tameris's house, where she had sexual intercourse with him again.  (Id. at 103).  Sometime later in August or early in September, Plaintiff and Tameris went out to dinner at a

-4-

steakhouse and then again had sex at Tameris's house.  (<u>Id.</u> at 106).

All three times that Plaintiff had sex with Tameris, Plaintiff drove herself to Tameris's house and no one forced her to go there.  (<u>Id.</u> at 110, 127).  She and Tameris discussed having a long-term relationship and talked about having children someday.  (<u>Id.</u> at 108). Sometimes Plaintiff would ride with Tameris in the truck on the beach while he was on duty but she was not; she did not remember whether she asked to ride in the truck or if Tameris suggested it.  (<u>Id.</u> at 122).  She and Tameris agreed to keep their relationship a secret, though he did not threaten her to keep quiet about it.  (<u>Id.</u> at 134).  The last text message between Plaintiff and Tameris was exchanged on September 13, 2008.  (<u>Id.</u> at 98).

Plaintiff also testified in her deposition that she had sexual intercourse with Defendant Simmons once.  Phone records reflect that Plaintiff and Simmons exchanged text messages from November 8, 2008 until November 29, 2008, and the sexual encounter occurred during that period of time.  (<u>Id.</u> at 135).  Simmons acknowledged in his deposition that he initiated the text messaging with Plaintiff after obtaining her cell phone number from an employee phone list. (Simmons Dep. at 10-11).  Some of the text messages were exchanged during the workday.  (<u>Id.</u> at 11).  Plaintiff had first met Simmons at the recruitment class she attended during her spring break.  (Pl. Dep. at 138).  She would see Simmons once in a while if he happened to be in the areas where she was working, but she had never had a personal conversation with Simmons until they began texting in November.  (<u>Id.</u> at 138-39).

Simmons told her in his text messages that he wanted to kiss her and, later, that he wanted to have sex with her.  (<u>Id.</u> at 140).  Plaintiff felt flattered but also "almost violated" by

Simmons's messages.[5]  (Id.).  She did not tell him this, though, because she "didn't know how."  (Id.).  One evening when Simmons was on duty patrolling near the beach, Simmons texted Plaintiff to come sit in the truck with him and hang out.  (Id. at 137).  Plaintiff was not working at that time, and she drove herself to meet Simmons; no one forced her to do so.  (Id. at 141).  She met him at the old Main Street Lifeguard Station, which was vacant because the Beach Patrol had moved to a new headquarters; Simmons opened the door for her and they had sex upstairs.  (Id. at 137-38).  Sometime thereafter, Simmons wanted to meet with Plaintiff again, which she assumed was also for the purpose of having sex; however, Plaintiff declined to meet him again.  (Id. at 142).

Plaintiff exchanged text messages with Defendant Duarte from November 21, 2008 until December 2, 2008.  (Id. at 150-51).  Plaintiff did not know who Duarte was until he left a message on her phone one Saturday when she was taking the SAT to see if she was available to work that day.  (Id. at 151-52).  Sometime thereafter, Plaintiff made the next contact by "reaching out" to Duarte to ask about her schedule, and the text messaging continued from there.  (Id. at 153).  Plaintiff would sometimes visit Duarte while he was dispatching but while Plaintiff was not working.  (Id. at 155-56).  One day when she and Duarte were texting, Duarte asked Plaintiff to meet him to watch a movie.  (Id. at 157).

---

[5]In approximately October 2008—sometime after she had stopped communicating with Tameris but before she started communicating with Simmons—Plaintiff had sexual intercourse on at least one occasion with another lifeguard with whom she was friends and who is not a named Defendant in this case.  (Pl. Dep. at 135, 243-44, 296, & 307-08).  Plaintiff distinguished her sexual encounter(s) with that lifeguard from those with named Defendants in part based on that lifeguard not sending her sexual text messages or "making advances" in the way that the Defendants did.  (Pl. Dep. at 308).

Plaintiff drove to the Granada bridge to meet Duarte, and she then got into Duarte's truck and they drove to another location and had sex in the back of the truck. (Id. at 158). Some time after that encounter, Duarte expressed interest in having sex again but Plaintiff declined. (Id. at 159-60).

Plaintiff told no one of the sexual incidents with these three men until February 2009, when her boyfriend of two months, Kristopher Yackel—who also worked as a lifeguard for the Beach Patrol—confronted Plaintiff about a rumor[6] he had heard regarding Plaintiff and Tameris. When Plaintiff admitted to Yackel that she had had sex with Tameris, Yackel encouraged her to tell her parents, and she did so. Shortly thereafter, Plaintiff and her father contacted an attorney.

Meanwhile, in early February 2009—prior to when Plaintiff informed her parents about the sexual liaisons—a rumor about Tameris engaging in sexual intercourse with Plaintiff made its way to Elisa Prugar, a female Beach Patrol captain with over twenty years of service. Prugar was told of the rumored activity by Jodie Stafford, a male lifeguard and friend of Yackel's.[7] Prugar immediately reported the rumor to one of the deputy chiefs at the Beach Patrol, and an Internal Affairs investigation was promptly initiated regarding Tameris. The names of Simmons and Duarte came up during the Tameris investigation, and Internal

---

[6]As is apparent from many of the depositions taken in this case, the Beach Patrol was known to be a rumor mill; the gossip level was described by one deponent as "worse than high school," (Stafford Dep. at 24-25).

[7]Stafford testified in his deposition that he learned of the rumor from Yackel; Yackel, on the other hand, testified that he learned of it from Stafford. (Stafford Dep. at 7; Yackel Dep. at 32).

Affairs investigations were later initiated regarding them as well.  All three were ultimately terminated from the Beach Patrol.[8]  Plaintiff has not worked for the Beach Patrol since December 2008 and now attends college in north Florida.

On August 6, 2010, Plaintiff filed this lawsuit.  In her Amended Complaint, she alleges three federal constitutional claims and six state law claims:  Count I—violation of her Fourteenth Amendment substantive due process rights (against all Defendants); Count II—violation of her Fourteenth Amendment equal protection rights (against all Defendants); Count III—violation of her Fourth Amendment (applicable through the Fourteenth Amendment) right to be free of unreasonable seizures (against all Defendants except Duarte); Count IV—negligent supervision against the County only; Count V—negligent retention against the County only; Count VI—battery against Tameris only; Count VII—battery against Simmons only; Count VIII—battery against Duarte only; and Count IX—intentional infliction of emotional distress against Tameris, Simmons, and Duarte.[9]  The summary judgment motions filed by Plaintiff (Doc. 109), Tameris and Simmons (Doc. 107), and the County and Sweat (Doc. 105) are now ripe for ruling.

## II.  Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine

---

[8]There is some discrepancy in the record as to whether Simmons resigned or was terminated.  (See, e.g., Simmons Dep. at 32-36; Exs. 26-28 to Sweat Dep.).  Tameris and Duarte were terminated.  (See Exs. 22 & 31 to Sweat Dep.).

[9]Defendant Sweat is named in Count IX of the Amended Complaint as well, but Plaintiff has now conceded that Count IX fails insofar as it is against Defendant Sweat.  (See Pl.'s Resp., Doc. 120, at 34-35; Joint Final Pretrial Stipulation, Doc. 144, at 6 n.1).

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  However, when faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).

"'In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.'  Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988), and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).

### III.  Discussion

#### A.  Plaintiff's Federal Claims (Counts I through III)

In Count I of the Amended Complaint, Plaintiff alleges that "Tameris, Simmons, and Duarte violated [her Fourteenth Amendment] Due Process rights by coercing her to engage in sexual intercourse with them."  (Am. Compl. ¶ 82).  In Count II, she alleges that these Defendants violated her Fourteenth Amendment Equal Protection rights via this same coercion.  (Id. ¶ 96).  And, in Count III, Plaintiff alleges that Tameris and Simmons violated

her Fourth Amendment right to be free from unreasonable seizure of her person "by utilizing their position as sworn law enforcement officers to coerce [her] into engaging in sexual intercourse with them."[10] (Id. ¶ 110). In each of these counts, she alleges that these three Defendants "were placed in a position to violate [her] constitutional rights by virtue of their employment in supervisory positions by" the County. (Id. ¶¶ 83, 97, 111). Defendants urge entitlement to summary judgment on each of these claims.

### 1. The Constitutional Rights at Issue

### a. The Fourth Amendment

Tameris and Simmons argue that Count III, Plaintiff's Fourth Amendment claim—in which Plaintiff asserts that the alleged sexual intercourse constituted an unreasonable seizure or use of excessive force because these two Defendants were sworn LEOs—is not viable under the circumstances of this case.[11]   The Court agrees.

There is conflicting case law regarding whether, and under what circumstances, sexual acts of police officers should be analyzed as Fourth Amendment unreasonable seizures or as Fourteenth Amendment violations of a substantive due process right to bodily integrity. Compare, e.g., Rogers v. City of Little Rock, 152 F.3d 790, 796 (8th Cir. 1998) ("This case is not about excessive force, but rather about nonconsensual violation of intimate

---

[10]Duarte was named in this count in the original Complaint (Doc. 1), but Plaintiff conceded at the motion-to-dismiss stage that this claim is not viable against Duarte because he was not a law enforcement officer at the time of the events at issue; the count was then dismissed insofar as it was brought against Duarte. (See Order, Doc. 77, at 11 (citing Doc. 72 at 9)).

[11]This argument was not made at the motion-to-dismiss stage of the case. (See Order on Mots. to Dismiss, Doc. 77, at 11 n.8).

bodily integrity which is protected by substantive due process.  No degree of sexual assault by a police officer acting under color of law could ever be proper.  The violation here is different in nature from one that can be analyzed under the fourth amendment reasonableness standard."), and Jones v. Wellham, 104 F.3d 620, 628 (4th Cir. 1997) (concluding that "[b]ecause the harm inflicted"—an alleged forcible rape by a police officer after a traffic stop—"did not occur in the course of an attempted arrest or apprehension of one suspected of criminal conduct, the claim was not one of a Fourth Amendment violation but of the violation of the substantive due process right under the Fourteenth Amendment"), with Fontana v. Haskin, 262 F.3d 871, 878-80 (9th Cir. 2001) (finding Fourth Amendment claim sufficiently stated where plaintiff—a motorist arrested after a motor vehicle accident—alleged that she was sexually assaulted in the back of a patrol car during ride to police station, "even though [the] case [did] not involve excessive force in the traditional sense"), Stidham v. Jackson, Civil Action No. 2:07cv00028, 2009 WL 792961, at *3 (W.D. Va. Mar. 24, 2009) (finding that forcible sexual assault, "carried out by a law enforcement officer in relation to his role as officer, amount[s] to a 'seizure' under the Fourth Amendment"), and Johnson v. Cannon, 947 F. Supp. 1567, 1572 (M.D. Fla. 1996) (denying motion to dismiss Fourth Amendment claim where plaintiff alleged that deputy sheriff sexually assaulted her at her residence after a traffic stop).

The circumstances of the instant case do not support a Fourth Amendment claim. Even if Tameris and Simmons could be found to have acted under color of law, that conclusion would be based not on their status as LEOs but on their employment at the Beach Patrol and their employment relationship with Plaintiff.  They were not arresting

Plaintiff and were not acting as LEOs at any relevant time.  Plaintiff's claims are premised on a coercive employment situation, not a coercive law enforcement-related situation.  Cf. Saunders v. Hunter, 980 F. Supp. 1236, 1244 (M.D. Fla. 1997) (noting, in § 1983 case brought by female corrections officer alleging sexual harassment, that "[t]he plaintiff ha[d] cited no cases, nor can the Court find any cases, where the Fourth Amendment was cited in an employment situation" and concluding that in the absence of "allegations that she was held in relation to a possible arrest" the plaintiff "failed to allege facts to support her Fourth Amendment claim").  Accordingly, summary judgment is due to be granted to Tameris, Simmons, the County, and Sweat on Count Three of the Amended Complaint.

b.  The Fourteenth Amendment

Counts One and Two of the Amended Complaint allege violations of Plaintiff's rights under the Fourteenth Amendment—Count One is rooted in the substantive due process component of the amendment, and Count Two is grounded in the Equal Protection Clause. Defendants do not challenge the possibility that Plaintiff can establish a substantive due process violation under the circumstances of this case if she can prove the requisites of such a claim, including abuse of authority under color of law, which is discussed later in this Order. However, Tameris and Simmons assert that the equal protection claim is redundant to the substantive due process claim, citing a case in which the Fifth Circuit held that an equal protection claim cannot be established on the same basis as a substantive due process violation unless there are "more extensive" damages on the equal protection claim than on the due process claim.  (Doc. 107 at 6 (citing Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 448 (5th Cir. 1994))).  They also argue that an equal protection violation requires an "intent

to discriminate based on gender," which they urge is absent here.  Plaintiff acknowledges that it is "largely true" that the equal protection claim is duplicative of the substantive due process claim but argues that she is nevertheless entitled to proceed on both theories as alternative claims, citing case law recognizing equal protection as a viable theory in employment-related cases.  (Doc. 122 at 14).

The equal protection claim will not be dismissed as duplicative or as a non-viable legal theory on the facts of this case.

### 2.  Color of Law

"In order to prevail on a civil rights action under § 1983, a plaintiff must show that he or she was deprived of a federal right by a person acting under color of state law."  Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001).  Defendants argue that Simmons, Tameris, and Duarte[12] were not "acting under color of law" at the time of the sexual encounters from which this case arises and that they are entitled to summary judgment on all of Plaintiff's constitutional claims on this basis.  As set forth below, the Court agrees.

"'Mere employment by a state or municipality does not automatically mean that a defendant's actions are taken under color of law.'"  Ottman v. City of Independence, 341 F.3d 751, 762 (8th Cir. 2003) (quoting Kern v. City of Rochester, 93 F.3d 38, 43 (2d Cir. 1996)).  "A person acts under color of state law when he acts with authority possessed by

---

[12]As noted earlier, Duarte has not filed a summary judgment motion.  However, the County and Sweat argue in their motion that none of the three primary individual Defendants was acting under color of law.  (See Doc. 105 at 16-21).

virtue of his employment with the state." <u>Griffin</u>, 261 F.3d at 1303.  "'The dispositive issue is whether the official was acting pursuant to the power [he] possessed by state authority or acting only as a private individual.'" <u>Id.</u> (quoting <u>Edwards v. Wallace Cmty. Coll.</u>, 49 F.3d 1517, 1523 (11th Cir. 1995)).

"'[U]nder "color" of law means under "pretense" of law,' [and] the acts of state officials 'in the ambit of their personal pursuits' do not constitute state action." <u>Waters v. City of Morristown</u>, 242 F.3d 353, 359 (6th Cir. 2001) (quoting <u>Screws v. United States</u>, 325 U.S. 91, 111 (1945)).  As the Eleventh Circuit Court of Appeals has explained, "[w]hether a government employee is acting under color of law is not always an easy call, and the color of law analysis inevitably requires that [courts] engage in line drawing." <u>Griffin</u>, 261 F.3d at 1303.  "It is only through a process of 'sifting facts and weighing circumstances' that [courts] arrive at a correct determination." <u>Id.</u> (citing <u>McDade v. West</u>, 223 F.3d 1135, 1139 (9th Cir. 2000)).

Defendants' argument on the "color of law" issue is twofold.  First, they argue that they lacked supervisory authority over Plaintiff and thus were incapable of committing acts against her "under color of law."  Second, they contend that assuming they had such capability, even under Plaintiff's account of the facts they did not invoke any authority and engaged in only private conduct with Plaintiff.  These assertions are addressed in turn.

Defendants correctly note that if Tameris, Simmons, and Duarte lacked supervisory authority over the Plaintiff, they could not have been acting "under color of law" because they would have had no state authority or position that they possibly could have used to violate

Plaintiff's rights.[13]  See, e.g., Edwards, 49 F.3d at 1523 (finding that co-employees without any supervisory authority over the plaintiff could not be held liable under § 1983 for creating a hostile work environment).  However, the parties disagree as to these three Defendants' authority over Plaintiff.

Plaintiff has not presented evidence to support a conclusion that Tameris had supervisory responsibility with regard to Plaintiff sufficient to render his actions potentially "under color of law."  Plaintiff refers to Tameris as a "law enforcement officer[] with supervisory authority over minor children."  (Doc. 120 at 23).  Tameris was a full-time employee and a sworn LEO, but that status does not render him a supervisor of Plaintiff or of any other Beach Patrol employee.  Plaintiff testified that the officers were there to assist the lifeguards with their duties if necessary, but she has presented no basis for concluding that Tameris was her supervisor or could affect the terms of her employment.  See Henry v. Pemiscot Mem'l Health Sys., No. 1:05CV00075 ERW, 2006 WL 2850550, at *12  (E.D. Mo. Oct. 3, 2006) (concluding, in § 1983 suit brought by emergency room nurse, that doctor did not hold supervisory authority where he "had the authority to direct employees in the emergency room, as to patient care" but "had no authority to affect, indirectly or directly[,] the terms and conditions of Plaintiff's employment," as "[h]e had no authority to hire, fire, promote or reassign Plaintiff to significantly different duties").

Plaintiff has also not presented evidence supporting supervisory authority of Duarte,

---

[13]As discussed earlier regarding the Fourth Amendment claim, the status of Tameris and Simmons as sworn LEOs is not the pertinent state actor status under the circumstances of this case.  It is supervisory power over the Plaintiff in the employment setting involved here that, if anything, could render their acts under "color of law."

who at the time of the events at issue was employed as full-time lifeguard with the title of Beach Safety Specialist. Plaintiff acknowledged in her deposition that Duarte was "not a supervisor," (Pl. Dep. at 153), but she claims that Duarte had power to affect assignment of lifeguards to towers, (id. at 263). Duarte did testify in his deposition that he sometimes would fill in for Liz–the woman who usually handled tower assignments—on Liz's days off. (Duarte Dep. at 86). He explained that on the days when he filled in for Liz, he would make sure that the schedule was complete and if not, he would highlight the problem areas and then hand the schedule sheet to the deputy chief when he arrived. (Id. at 86-87). This evidence does not establish that Duarte had supervisory authority over Plaintiff for § 1983 "color of law" purposes.

Unlike Tameris and Duarte, Simmons did have some supervisory responsibility over Plaintiff and others—even over Tameris. During 2008, Simmons was one of several captains in the Daytona Beach zone, and for each daily shift one of these captains was the supervisor of all of the employees in the zone, including the lifeguards and the other LEOs. Thus, on those days when Plaintiff worked in the Daytona zone and Simmons was designated as the captain in charge for that day, he was her shift supervisor. Simmons testified that he had the power to issue written reprimands to those under his supervision, though he could not make hiring or firing decisions on his own. (Simmons Dep. at 58, 69-70). He also denied having the ability to decide which lifeguards did or did not work in his zone, though he could give input in that regard. (Id. at 77-79). Other witnesses provided similar testimony to the effect that as a captain, Simmons had responsibility for the daily operation of his zone, including assignments, preparation for the morning drill, and

determining which towers in the zone would be open. (Bussinger Dep. at 20-21). Captains also could issue write-ups for disciplinary reasons, (<u>id.</u>), but could not hire, fire, or demote and at most could suspend an employee for an eight-hour period, (<u>id.</u> at 73). (<u>See also</u> Hensler Dep. at 14, 30 (captains at most could refer someone to see a deputy chief for a write-up and could not affect scheduling, though they could make requests regarding who was in their zones); Prugar Dep. at 36-37 (captains did not have decisionmaking authority regarding whether a part-time lifeguard would get rehired but could give input regarding good employees and request that lifeguards be in a certain zone)). In sum, there is record evidence that Simmons did have some power to direct and affect the part-time lifeguards and other employees in his zone, even though he could not hire, fire, or demote them on his own.

Even if Simmons or Tameris or Duarte had some supervisory authority over Plaintiff, however, that would only give that Defendant the potential to have acted "under color of law"; it would not establish that he did so at the time of the events at issue here, for one's status as a supervisor does not render all of that person's activities "under color of law." As earlier noted, "the acts of state officials 'in the ambit of their personal pursuits' do not constitute state action." <u>Waters</u>, 242 F.3d at 359 (quoting <u>Screws</u>, 325 U.S. at 111).

The leading case in the Eleventh Circuit on this issue is <u>Griffin</u>, in which the court explained the necessity that courts "engage in line drawing" in analyzing the color-of-law issue. 261 F.3d at 1303. <u>Griffin</u> involved an after-hours sexual assault of a city employee by her supervisor—the city manager—and the court drew a line "between those cases where a state actor directly uses his official authority to create the opportunity to sexually assault the victim and those cases where a state actor merely uses his authority to develop or

facilitate a relationship of trust with a victim, even though that relationship in some attenuated sense serves as a but for cause of a later sexual assault." 261 F.3d at 1307 n.12.  While the circumstances of <u>Griffin</u> fell on the "color of law" side of the line, the facts of the instant case, even when construed in the light most favorable to Plaintiff, fall on the other side.

The Eleventh Circuit concluded in <u>Griffin</u> that the city manager was acting under color of law at the time of the sexual assault, which occurred at the plaintiff's apartment after a Rotary Club function that "was very important in the workplace culture of the City and was attended by the Mayor, commissioners, [the defendant city manager], and several City department heads." <u>Id.</u> at 1300.  The plaintiff had arranged for a ride home from the event with the police chief, but the city manager told her and the police chief that he would take her home instead.  When the plaintiff and the city manager arrived at the apartment, the city manager followed her in uninvited and asked her to get him a drink.  He then "came up behind her in the kitchen and raped her." <u>Id.</u>  That event followed a campaign of unwelcome harassment of the plaintiff that had begun almost immediately after the city manager obtained his job four months earlier.

The <u>Griffin</u> court emphasized that the city manager "intervened and invoked his authority as City Manager to create the opportunity to be alone with Griffin, to take her home, and then to rape her." <u>Id.</u> at 1304 (footnote omitted).  There was also evidence that immediately prior to the rape, when Griffin rejected his sexual advances in the kitchen, the city manager "reminded her of his authority by saying 'I can't believe you are telling me no after everything that I have done for you.'" <u>Id.</u>  The court found that "[f]rom day one, he utilized his authority as City Manager to harass and intimidate her by repeatedly insisting she

owed him something for 'all of the things' that he did for her . . . [and] threatening her with her job if she did not do certain things for him." Id. at 1305.  The court concluded that the city manager's "pattern of harassment and the assertion of control over Griffin both at the workplace and beyond is what differentiates this case from those where a police officer or teacher befriends or meets a victim while acting in the course of his official duties[] but then later assaults [the victim] off-duty, off premises, while acting in a private or personal capacity." Id. at 1307.

In contrast to the facts of Griffin, Plaintiff's description of the events of the instant case does not support a finding that any of the three Defendants involved was acting under color of law at the time of the claimed sexual activity.  At most, these Defendants may have "used [their] authority to develop or facilitate a relationship" with Plaintiff, but under Griffin that is to be distinguished from "directly us[ing] official authority to create the opportunity" to have sex with the victim. Id. n.12.  There is no "pattern of abuse of authority" to be considered collectively here as there was in Griffin, and there is no evidence—even from Plaintiff—that the Defendants ever threatened Plaintiff or otherwise mentioned any authority over her at any time.  Plaintiff has acknowledged that she willingly and voluntarily drove herself to meet each of these Defendants for the liaisons, none of which occurred while she was working; only one—the encounter with Simmons—is alleged to have occurred while any of the participants was on duty.  Even as to Simmons, however, the liaison occurred in a county building that had been closed in favor of a new facility, and being in that building to have sex

with Plaintiff was not part Simmons's duties.[14]  The location of that encounter is not sufficient

to render Simmons's actions at the time "under color of law."  <u>See, e.g.</u>, <u>Burris v. Thorpe</u>,

166 F. App'x 799, 802-03 (6th Cir. 2006) (affirming summary judgment for police officer,

agreeing that officer was not acting under color of state law when he had consensual sexual

relationship with woman whom he met during "citizen ride-alongs," even though some of the

liaisons occurred while he was on duty and in uniform; the plaintiff conceded that the officer

"'never used his position as a police officer to coerce her to have sex with him, or to prevent

her from breaking off the relationship'") (quoting the district court's order).  Moreover, the fact

that some text messages may have been exchanged during work hours does not render the

sexual encounters "under color of law."

      The cases upon which Plaintiff relies in arguing that the three Defendants were acting

under color of law are distinguishable.  In <u>Doe v. Taylor Independent School District</u>, 15 F.3d

443 (5th Cir. 1994), a high school teacher had a sexual relationship with a fifteen-year-old

student, and in discussing the "color of law" element in a footnote the court found that the

teacher "took full advantage of his position as [her] teacher and coach to seduce her," noting

that he required the student to do little or no work yet still gave her A's; that he spoke to

another teacher about raising the student's grade in that teacher's class; and that some of

the sexual activity occurred on the school premises during the school day.  15 F.3d at 452

---

[14]Simmons testified in his deposition that he has not worked any night shifts since becoming a captain.  (Simmons Dep. at 9-10).  However, the Court must credit Plaintiff's testimony at this stage of the case and accepts as true her testimony that Simmons was working a night shift patrolling the beach when he asked her to meet him at the closed Main Street building.

n.4.  Plaintiff has identified no similar favoritism shown to her as part of the Defendants'

alleged campaign to abuse their power to have sex with her.

The other case cited by Plaintiff, Hackett v. Fulton County School District, 238 F.

Supp. 2d 1330 (N.D. Ga. 2002), involved a high school science teacher who approached the

plaintiff, an eleventh-grade student, about a "scholarship opportunity" that actually was a

complete fiction created by the teacher.  The teacher selected the plaintiff and four other

students to participate in the alleged "scholarship program" by participating in "projects" at

the teacher's house.[15]  The Hackett court, after noting that the facts presented a "close call"

as to the "color of state law" issue under the analysis outlined by the Eleventh Circuit in

Griffin, concluded that the teacher was indeed acting under color of law.  The court noted

that the teacher knew of plaintiff's particular interest in science and in attending the school

for which the scholarship would provide funding and, taking advantage of his teaching

position, was able to fabricate the scholarship program and lure the plaintiff and others to his

home.  The court thus found that the incidents occurred as a result of the teacher's position

as a teacher.  The instant case is devoid of such facts.

Again, Plaintiff does not contend that any of the Defendants affirmatively asserted any

authority over her—at the time of the sexual encounters or otherwise.  She has admitted that

her intimate relationships with each of these three men were "consensual" from her

perspective and that she voluntarily drove to each of the encounters without being forced to

---

[15]One such project involved counting vertebrae (during which the teacher touched other students but not the plaintiff) and another involved the plaintiff being blindfolded while alleged "doctors" entered the room and touched plaintiff; plaintiff was then supposed to guess the gender of each doctor.

do so.  (Pl. Dep. at 166).  She testified that she and Tameris discussed having a future together and even having children some day, (id. at 108); she also explained that she enjoyed visiting with Duarte, (id. at 342).  Absent evidence of any assertions of authority by Defendants, Plaintiff relies on asserted "fears of retribution" if she did not submit to their advances to attempt to establish the "color of law" element.  This effort fails.

Case law instructs that the focus of the color of law analysis is on the actions of the state actor rather than on the perceptions of the plaintiff as to the capacity in which he is acting.  See Wilborn v. Payne, No. 09-2545-STA-dkv, 2011 WL 5517184, at *6 (W.D. Tenn. July 29, 2011) ("The test for whether a state actor acted under color of law is 'not what the victim knew about the [actor] at the time of the incident but rather what actions did the [actor] take to assert his authority under color of state law.'" (quoting Mooneyhan v. Hawkins, No. 96-6135, 1997 WL 685423, at *4 (6th Cir. Oct. 29, 1997)) (alteration in original)); see also S.J. v. Kansas City Pub. Sch. Dist., 294 F.3d 1025 (8th Cir. 2002) (school volunteer was not acting under color of law when he assaulted minor "in his own home and in circumstances unrelated to his role as a school volunteer," even though volunteer first met the minor at the school and the child's mother allowed her to live with the volunteer based in part on his status as a school volunteer); Roe v. Humke, 128 F.3d 1213, 1217 (8th Cir. 1997) (affirming summary judgment for defendants where police officer met eleven-year-old while providing security services at school but sexually abused her on his farm, concluding that knowledge of the officer's status by the victim and her parents was not enough "to convert the actions [that the officer] took in the pursuit of his private interests into action taken under color of law"); Harmon v. Grizzel, No. 1:03CV169, 2005 WL 1106975, at *6-7 (S.D. Ohio Apr. 21,

2005) (concluding that police officer was not acting under color of law when he committed sex act in woman's car; even though woman testified that she followed the officer at his direction prior to the event "out of respect for his authority," the officer was not purporting to exercise authority of a police officer and his conduct was "purely private conduct").

Plaintiff's subjective fear of retribution alone is insufficient to establish that any of the Defendants was acting under color of law.  To hold otherwise would convert the private conduct of government employees into action "under color of law" any time the "victim" of the acts subjectively felt affected by their status as a state actor, which is not proper.  Cf. Kaplan v. Premiere Radio Networks, Inc., No. 01 C 8706, 2002 WL 31356442, at *6 (N.D. Ill. Oct. 17, 2002) (noting, in Title VII constructive discharge case, that the plaintiff's "subjective belief that she would have to submit to [manager's] sexual advances does not establish that a reasonable person would have felt compelled to choose between submission or resignation").

Moreover, Plaintiff has not established a foundation for her feared of reprisals.  She had no knowledge of any other lifeguard being punished for not submitting to sexual advances or threatened with such punishment.[16]  (Pl. Dep. at 128-29).  She claims that she feared being demoted, being put in another zone, not getting work, rumors being spread about her, and being made to not "look like a good lifeguard or a nice person," (id. at 125,

---

[16]Plaintiff does cite the deposition testimony of Danielle Smith to the effect that Tameris threatened Smith with a reprimand if she would not go out with him.  (Smith Dep. at 81).  However, there is no evidence that Plaintiff knew of this threat at any time prior to Smith's July 2011 deposition.  Incidentally, Tameris never followed through on his threat to Smith.  (Id. at 84).

127); having things "said against [her], not in [her] favor," (id. at 166); and not being rehired the following summer, (id. at 190).  She also testified that she feared that she would "not be well-liked" at the Beach Patrol if she did not engage in sexual activity.  (Id. at 399). Elsewhere in her deposition, Plaintiff explained that by "demoted" she meant being placed in a different zone,[17] but she acknowledged that "[a]ll zones are equal."  (Id. at 129).  She merely "enjoyed" sitting in the Daytona zone because she regarded it as the most prestigious zone.[18]  (Id. at 130).  She also stated that her understanding regarding rehiring was that the procedure was to simply call in and tell Liz, who was in charge of scheduling, that she wanted to be put back on the schedule, (id. at 198), and Plaintiff lacked knowledge as to whether Tameris, Simmons, or Duarte had any input about whether a minor lifeguard would be rehired, (id. at 199-200).  Plaintiff's subjective, equivocal speculation about whether Defendants would affect her work circumstances in some way if she rejected their advances does not establish an abuse of authority and does not render their conduct "under color of law."

In sum, construing the summary judgment evidence in the light most favorable to Plaintiff, as a matter of law Tameris, Simmons, and Duarte were not acting "under color of law" at the time of their alleged sexual encounters with Plaintiff.  Unlike the city manager in Griffin, these Defendants never asserted any control over Plaintiff.  This case falls on the

_____

[17]As a part-time, seasonal lifeguard, apparently Plaintiff could not be "demoted" because there was no position to which she could be demoted.

[18]Her own brother, on the other hand, did not like the Daytona zone and preferred the Ormond Beach zone.  (Shea Drury Dep. at 39).

other side of the line drawn by the Griffin court—at most, Tameris, Simmons, and Duarte "became acquainted with or developed a relationship with [Plaintiff] pursuant to [their] official duties," but then the sexual acts "w[ere] committed completely away from and outside the ambit of [their] official duties or obligations." Griffin, 261 F.3d at 1307. They were not acting "under color of law." Accordingly, all Defendants are entitled to summary judgment on Counts I, II, and III on this basis.

### 3.  Liability of the County and Sweat

In her constitutional claims, Plaintiff has also named the County and the Director of the Beach Patrol, Sweat, as Defendants. Although the determination made earlier in this Order that Tameris, Simmons, and Duarte were not "acting under color of law" is dispositive of these claims insofar as they are brought against the County and Sweat as well, the Court will nevertheless address the other arguments against liability made by the County and Sweat in their summary judgment motion (Doc. 105).

"The law is clear that a municipality cannot be held liable for the actions of its employees under § 1983 based on a theory of respondeat superior." Griffin, 261 F.3d at 1307. In other words, local governments "are not vicariously liable under § 1983 for their employees' actions." Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011). "Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." Id. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Id.

Similarly, "'[i]t is well established in this circuit that supervisory officials are not liable

under § 1983 for the unconstitutional acts of their subordinates' unless the 'supervisor personally participates in the alleged constitutional violation' or 'there is a causal connection between actions of the supervising official and the alleged constitutional deprivation.'" Doe v. Sch. Bd. of Broward Cnty., 604 F.3d 1248, 1266 (11th Cir. 2010) (quoting Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999)).   Here, Sweat is not alleged to have personally participated in the alleged constitutional violations, so the only potential basis for supervisory liability is a causal connection between Sweat's actions and the alleged constitutional violation.

"This requisite causal connection can be established in the following circumstances: (1) when a 'history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so' or (2) when a supervisor's 'improper custom or policy results in deliberate indifference to constitutional rights.'" Id. (quoting Hartley, 193 F.3d at 1269).   "For a history of abuse to be sufficiently widespread to put a supervisor on notice, the abuse must be 'obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.'" Id. (quoting Hartley, 193 F.3d at 1269). "'[A] few isolated instances of harassment will not suffice'" to establish "the existence of widespread abuse." Id. (quoting Braddy v. Fla. Dep't of Labor & Emp't Sec., 133 F.3d 797, 802 (11th Cir. 1998)).

Plaintiff argues that the evidence establishes that the County and Sweat "were aware of an obvious risk to constitutional rights that persisted for decades and failed to take corrective action even when actual instances of sexual abuse by its officers were brought to their attention." (Doc. 120 at 25).  With a much narrower focus now than in the Amended

Complaint,[19] Plaintiff contends that the remedial action the County and Sweat should have undertaken was "a training regime for minor lifeguards regarding sexual harassment and means of reporting violations." (Id.).   However, Plaintiff has not established a basis for municipal or supervisory liability.

_____

[19]In the Amended Complaint, Plaintiff alleged that "sexual encounters between underage lifeguards and officers and senior lifeguards . . . w[ere] both part of the culture of the Beach Patrol and a condition for employment of Plaintiff and other minors." (Am. Compl. ¶ 42).  Plaintiff asserted that it was "common knowledge" that minor lifeguards would "be expected to have sexual intercourse with the officers and adult lifeguards" employed by the Beach Patrol and that such sex was "considered a 'rite of passage' among the minor lifeguards." (Id. ¶ 47).   The Amended Complaint also stated that it was "'common knowledge' that minor lifeguards [would] not be re-hired the following summer unless they [had] engaged in sex with officers and adult lifeguards." (Id. ¶ 48).  Minors were allegedly "placed in coercive situations where sexual intercourse was required as a condition of their employment," (id. ¶ 49), and such coerced intercourse "was not an occasional occurrence . . . but . . . a regular fact of life . . . occurring over the course of many, many years," (id. ¶ 51).

Plaintiff also alleged that high-level County employees, including Sweat, knew or should have known of these "frequent sexual encounters," which "may have involved dozens of innocent young women." (Id. ¶¶ 55-56).  The "common knowledge" of this "culture of sex" allegedly extended to the high school students who applied for jobs as lifeguards, and "[s]exual intercourse with officers and senior officers [sic] was accepted as a condition of employment by those young applicants." (Id. ¶ 57).  The County allegedly took no action to correct the "culture of abuse"; Plaintiff alleged lack of training—both lack of training of minor lifeguards and lack of of training "to educate and sensitize full-time officers and lifeguards to the risks (and actual prevalence) of sexual abuse directed to those minor children employed as lifeguards." (Id. ¶¶ 65-67).  The County allegedly "fostered and encouraged [the] culture of sexual abuse and depravity" and Sweat allegedly "had actual knowledge that the [Beach Patrol] encouraged and coerced minors employed as lifeguards to engage in sexual intercourse with the officers and senior lifeguards." (Id. ¶¶ 84, 87).

The allegations of a "culture of abuse," "common knowledge," "rite of passage," and sex as a "condition of employment" for minors have not been borne out by discovery in this case.   As aptly noted by the Defendants, no witness has provided testimony to this effect—including Plaintiff and her brother.  Plaintiff acknowledged, that, as would seem to be logical, she would not have wanted to work at the Beach Patrol had such a known culture of abuse been present, and her brother would not have allowed her to work there if such conditions existed. (Pl. Dep. at 182; Shea Drury Dep. at 83-84).  Plaintiff now confines her arguments of prior known sexual acts to those four incidents discussed in the text.

"In limited circumstances, a local government's decision not to train certain employees . . . may rise to the level of an official government policy for purposes of § 1983." Connick, 131 S. Ct. at 1359.  However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Id.  "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of the persons with whom the [untrained employees] come into contact.'" Id. (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)).

As noted by the County and Sweat in their Reply, and as reflected in the authority quoted above, the "failure to train" at issue in a § 1983 claim generally refers to failure to train the **perpetrators** of the alleged constitutional violation—not, as Plaintiff alleges here, failure to train the **victims**.  Apparently in the face of evidence that the Beach Patrol's LEOs did receive sexual harassment training[20]—as well as the fact that the LEOs are already trained and well-aware of state legal proscriptions on sexual activity with minors[21]—Plaintiff has chosen to focus on this novel "failure to train the potential victims" theory without citing any legal support for such an approach.  Even assuming arguendo that such a theory is

---

[20]See Doc. 120 at 26 n.20 (statement in Plaintiff's response memorandum that "[t]he fact that the County's law enforcement officers received such training is laudable, but insufficient").

[21]See, e.g., Doe v. City of Demopolis, 799 F. Supp. 2d 1300, 1314 (S.D. Ala. 2011) ("The City was entitled to rely on the common sense of Smith and other police officers not to sexually assault children, and therefore was not bound to provide training or supervision to them on that point. . . . Any police officer would know that he is not supposed to commit statutory rape.  There is no evidence, and no reason to believe, that training or supervision by the City was reasonably necessary to educate and deter police officers from such conduct, as would be necessary for Doe to reach a jury on Count Two's deliberate indifference theory.").

legally viable as a general proposition, Plaintiff has failed to establish deliberate indifference to a known or obvious need for better training of minor lifeguards.

"[W]hen [municipal] policymakers are on actual or constructive notice that a particular omission in their training program causes [violations of constitutional rights], the [municipality] may be deemed deliberately indifferent if the policymakers choose to retain that program." Connick, 131 S. Ct. at 1360. "A pattern of similar constitutional violations . . . is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Id. (quoting Bd. of Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 409 (1997)). "Policymakers' 'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"—necessary to trigger municipal liability.'" Id. (quoting Bryan Cnty., 520 U.S. at 407). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Id.

Plaintiff attempts to establish the liability of the County and Sweat by pointing to four[22] prior alleged instances of sexual misconduct by adult Beach Patrol employees and, to a lesser extent, by suggesting that the risk of minor lifeguards being victims of sexual abuse was so "obvious" as to put the County on notice of a need for training in any event. Plaintiff's efforts fail on both fronts.

_____

[22]Plaintiff now acknowledges that some other instances of alleged sexual activity may not have been reported to the County; thus, Plaintiff does not seek to rely on those instances as establishing notice to the County or Sweat of a need for better training. (See Doc. 120 at 30 n.21).

First, Plaintiff argues that four "instances of sexual harassment" by adult lifeguards in the seven years prior to Plaintiff's employment establish deliberate indifference by the County and Sweat.  However, the record evidence as to these incidents does not support a basis for holding the County or Sweat responsible for the conduct of Tameris, Simmons, or Duarte in the case at hand.

The first incident occurred in July 2001 and involved a Beach Patrol officer named Stephen Booth who worked in the New Smyrna Beach zone.  Plaintiff asserts that Booth "was involved in a sexual relationship with," (Doc. 120 at 10), and "engaged in sexual intercourse with," (id. at 30), a fifteen-year-old girl —not employed by the Beach Patrol —whose family owned a restaurant near Booth's lifeguard tower.  As explained by Daniel Kennedy, the New Smyrna Beach Police Department ("NSBPD") detective who investigated the case, the girl's mother and stepfather made a report of this July 2001 activity in October 2001.  (Kennedy Dep. at 5).  With the parents' knowledge and permission, Booth, who was twenty-five at the time, had been dating the girl, but when things heated up between the two the mother had put an end to the relationship.  (Id. at 7-11).  Kennedy interviewed the girl, and she reported that one night Booth had "felt her breasts under her bra" and had digitally penetrated her.  (Id. at 11).  In an interview with Kennedy, Booth acknowledged dating the girl but denied the alleged improper touching.  (Id. at 15).  Kennedy prepared a report and it was reviewed by the state attorney's office, which declined to pursue it; two years later, the girl recanted the accusations of improper conduct against Booth.  (Id. at 18-20). .  Kennedy informed the Beach Patrol of the NSBPD investigation.  (Id. at 13).  Booth had resigned from the Beach Patrol in August 2001 to return to school—two months before the parents reported

the incident to the NSBPD and four months before Sweat became director of the Beach Patrol.

The next incident relied upon by Plaintiff also occurred in 2001 and involved another New Smyrna Beach lifeguard, Shawn Jones, who dropped his towel in a locker room and thereby exposed himself to two female Beach Patrol employees.  As noted by Defendants, the two females were adult lifeguards, and the incident was reported and Jones was fired because of his conduct.  (See Sweat Dep. at 101).

Third, Plaintiff points to a 2003 incident involving a Beach Patrol officer named Daryl Shone.  As characterized by Plaintiff, Shone "groped a seasonal lifeguard . . . while bragging rather explicitly about the prowess of his tongue" and "propositioned [her] for sex."  (Doc. 120 at 10, 18).  The seasonal lifeguard submitted a sworn statement to the Beach Patrol about the incident; on it, her age is listed as "18" and she describes Shone making inappropriate comments about his sex life and, later in the conversation, while touching her leg as she sat on her lifeguard tower, stated "let's see if you are as smooth as I am"—the apparent "groping" referenced by Plaintiff.  (Statement of 09/01/03, Ex. 9 to Sweat Dep.).  After this incident, Shone was suspended without pay for five days and was ordered to attend sexual harassment training.  (See Exs. 12 & 13 to Sweat Dep.).

The fourth and final incident upon which Plaintiff relies is a December 2006 incident involving a seventeen-year-old lifeguard, Danielle Smith, and an adult Beach Patrol employee, Curtiss Geber[23]; Smith testified in her deposition that Geber performed oral sex

_____

[23]This incident gave rise to another lawsuit filed in this Court, Smith v. Volusia County et al., Case No. 6:11-cv-35.

-31-

on her at his home after Smith went home with him from a bar one night.[24]   Smith's stepfather found out that Smith did not spend the night where she was supposed to and ultimately reported to the Beach Patrol that Smith had spent the night at Geber's house.  An Internal Affairs investigation was initiated by the Beach Patrol, and Defendants have presented unrebutted evidence that Smith's stepfather declined to provide a statement or to allow Smith to provide one.  Geber resigned almost immediately and also refused to provide a statement.  Although Smith's deposition has now revealed the events of that evening, it has not been shown that the County knew any details about what had happened until that deposition was taken in July 2011 despite efforts to uncover them in the attempted Internal Affairs investigation.

In sum, while inappropriate behavior by adult Beach Patrol employees has certainly been identified here, none of it rises to the level of establishing deliberate indifference by the County or Sweat to a need for better training to prevent sexual activity between adult employees and minor lifeguards.  This is particularly so considering that Plaintiff urges not a need for better training of adult lifeguards but of minor lifeguards; in three of the four instances relied upon by Plaintiff, no minor lifeguard was involved.  Further, in each instance where the offending lifeguard was employed at the Beach Patrol at the time the activity was reported, investigatory or disciplinary action was taken.  Although Plaintiff finds fault with the

---

[24]Smith testified in her deposition that she went to a bar with a female friend with whom she was supposed to spend the night.  Geber had told Smith he would be at the bar. The friend left the bar to spend the night with her boyfriend, and Smith, who had consumed several alcoholic beverages by that point, had nowhere to go.  Geber offered to let her sleep on his couch.  Smith drove to Geber's house and spent the night there; the next morning, the sexual conduct occurred.

response taken by the Beach Patrol, the Court cannot find the action taken improper, and these incidents, even taken collectively, do not establish deliberate indifference to a need to train minor lifeguards about the dangers of sexual misconduct or how to report it.[25]  See Connick, 131 S. Ct. at 1360 ("'[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" (quoting Bryan Cnty., 520 U.S. at 410) (internal quotation omitted)).

Plaintiff also asserts that even aside from the evidence of the four incidents recounted above, this case presents the rare situation where the likelihood of a constitutional violation is "so obvious" that a governmental entity will be found to have acted with deliberate indifference if it does not take action to prevent violations even in the absence of similar prior incidents.  In Connick, the Supreme Court recounted that in its City of Canton opinion it had "left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference."  Connick, 131 S. Ct. at 1361 (quoting Bryan Cnty., 520 U.S. at 409).  However, this possibility of "single-incident liability" left open by City of Canton exists only where "the unconstitutional consequences of

------

[25]Plaintiff also suggests—though emphasizing that it is "not the principal basis of [her] claim—that "Volusia County knew or should have known that Tameris was very likely to engage in sexual abuse based on his past history and widespread reputation as a playboy among Beach Patrol employees."  (Doc. 120 at 28).  However, a "reputation as a playboy" is not sufficient to establish a likelihood of "sexual abuse."  Several witnesses did give deposition to the effect that Tameris was a flirt, had earned the nickname—among others— "Beautiful Bobby," and that he "liked younger women."  None of the witnesses equated "younger women" with minors, though, and given that Tameris was forty-three years old, there was a twenty-five-year range of adult women who would qualify as "younger women."

failure to train [are] patently obvious."[26]  Id.

Plaintiff asserts "that exposing bikini-clad[27] sixteen[-] and seventeen[-]year[-]old girls to the sexually charged atmosphere at the Beach Patrol was a recipe for disaster" and that "[t]he probability that an older Beach Patrol officer would be tempted to use his position to seduce vulnerable young lifeguards is obvious to the point of inevitability."  (Doc. 120 at 26).  The Court rejects out of hand these assertions of "obviousness to the point of inevitability."

In sum, Plaintiff has not established a basis for municipal or supervisory liability here.  She has cited no legal authority for a basis to train potential victims, and she has not presented a factual basis for a finding of "deliberate indifference" by the County or the Director of the Beach Patrol in any event.  The County and Sweat thus are entitled to summary judgment on Plaintiff's constitutional claims for this reason as well as because of the lack of evidence that Tameris, Simmons, or Duarte acted "under color of law."

B.  State Law Claims (Counts IV Through IX)

Plaintiff's six remaining claims are state law claims, at least some of which are addressed in one or more of the pending summary judgment motions.  In light of the Court's disposition of the federal claims—the only claims over which it has original jurisdiction—and Defendants' argument presenting a novel issue of state law with respect to the possible

---

[26]The rare situation was described in City of Canton through "the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force."  Connick, 131 S. Ct. at 1361 (citing City of Canton, 489 U.S. at 390 n.10).

[27]As noted by Defendants, the uniforms of the female lifeguards were not bikinis but bathing suits with a t-shirt and shorts over them, and the guards were prohibited from rolling up their shorts.

defense of consent to Plaintiff's civil battery claims,[28] the state law claims will be dismissed without prejudice so that Plaintiff may, if she chooses, pursue them in state court.  See 28 U.S.C. § 1367(c).

### IV.  Conclusion

Although Plaintiff has not prevailed on her constitutional claims, the allegations regarding the actions of these public employees are certainly troubling.  As another court has phrased it, the described conduct, "'while reprehensible and to be condemned in the strongest possible terms, was [perhaps] a private tort committed by a person acting in a purely private capacity.'"[29]  Moreover, the conduct may amount to violations of Florida's criminal statutory rape provision, which at least one of the three Defendants has been charged with transgressing.  However, "the contours of [Fourteenth Amendment substantive rights] do not turn on the intricacies of state law,"[30] and absent evidence, at a minimum, that Tameris, Duarte, or Simmons used state-conferred authority in connection with these events Plaintiff's remedy, if any, lies beyond the United States Constitution.

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

---

[28]Although Plaintiff asserts that this Court has already rejected Defendants' consent argument in footnote in a prior Order, (see Doc. 122 at 21 (citing Doc. 77 at 9 n.7)), the Court did not do so in that footnote.  Rather, that footnote addressed counsel's confusing references to consent with regard to statutory rape.  The battery claim was not challenged by any Defendant in the motions addressed in that Order, and the arguments regarding consent in connection Plaintiff's civil battery claim were not presented at that time.

[29]Roe v. Humke, 128 F.3d 1213, 1218 (8th Cir. 1997) (quoting district court order).

[30]Douglas v. Brookville Area Sch. Dist., 2011 WL 6116449, at *15 (W.D. Pa. Dec. 8, 2011)

-35-

1.  The Motion for Summary Judgment (Doc. 105) filed by Defendants Volusia County and Kevin Sweat is **GRANTED** as to Counts I, II, and III.  In light of Plaintiff's concession as to Count IX against Defendant Sweat, this motion is also **GRANTED** as to Count IX.

2.  The Motion for Summary Judgment (Doc. 107) filed by Defendants Jecoa Duane Simmons and Robert Paul Tameris is **GRANTED** as to Counts I, II, and III.

3.  The Motion for Summary Judgment (Doc. 105) filed by Defendants Volusia County and Kevin Sweat, the Motion for Summary Judgment (Doc. 107) filed by Defendants Jecoa Duane Simmons and Robert Paul Tameris, and the Motion for Partial Summary Judgment (Doc. 109) filed by Plaintiff **are DENIED without prejudice** as to Plaintiff's remaining state law claims.  Pursuant to 28 U.S.C. § 1367(c), Plaintiff's state law claims (Counts III, IV, V, VI, VII, VIII, and IX)—with the exception of Count IX as against Defendant Sweat, which has been disposed of above—are hereby **DISMISSED without prejudice** to Plaintiff pursuing them in state court.  As set forth in 28 U.S.C. § 1367(d), the period of limitations is tolled for a period of thirty days after this dismissal unless Florida law provides for a longer tolling period.

4.  All other pending motions are **DENIED as moot**.

5.  The Clerk is directed to enter judgment providing that Plaintiff shall take nothing from any Defendant on the federal claims in Counts I, II, and III of the Amended Complaint and shall take nothing from Defendant Sweat on Count IX of the Amended Complaint.  Thereafter, the Clerk shall close this file.

**DONE** and **ORDERED** in Orlando, Florida this 19th day of January, 2012.

_____
JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record